# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2045

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| John J. Fellers, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 13, 2004
Filed: February 15, 2005

_____

Before WOLLMAN, LAY, and RILEY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

This case returns to us on remand from the Supreme Court. We affirm Fellers's conviction, but remand to the district court for resentencing.

## I.

Two policemen went to Fellers's home in Lincoln, Nebraska, to arrest him on February 24, 2000. After the officers entered the home, they told Fellers that a grand jury had indicted him for conspiracy to distribute methamphetamine, that the indictment concerned an alleged conspiracy with certain named persons, and that the

officers had a federal warrant for his arrest. Fellers stated that he knew the co-conspirators in question and that he had used methamphetamine in the past.

After about 15 minutes, the officers arrested Fellers and transported him to jail. Fellers was booked and taken to an interview room, where the officers gave him a full Miranda warning. Fellers waived his Miranda rights both verbally and in writing, repeated the statements he had made at his home, and stated that he had purchased methamphetamine from some of the co-conspirators named in the indictment. Fellers admitted knowing several more individuals and that he had purchased methamphetamine from some of them and used methamphetamine with some of them. He also stated that he had loaned money to another co-conspirator even though he suspected that the money might have been used for drug transactions. Throughout his jailhouse interrogation, however, Fellers repeatedly denied that he had ever sold methamphetamine.

Following a magistrate judge's hearing and recommendation, the district court suppressed the statements made at Fellers's home, but allowed Fellers's jailhouse statements to be introduced at trial. A jury found Fellers guilty of conspiracy to distribute and to possess with intent to distribute between 50 and 500 grams of methamphetamine. At sentencing, over Fellers's objection, the district court found that Fellers was actually responsible for more than 500 grams of methamphetamine and accordingly raised Fellers's base offense level from 30 to 32. The district court also raised Fellers's criminal history category from category II to category III based upon conduct underlying a prior guilty plea, even though the conviction entered pursuant to the plea was later expunged.

We upheld Fellers's conviction against Fifth and Sixth Amendment challenges and held that Fellers's jailhouse statements were admissible under Oregon v. Elstad, 470 U.S. 298 (1985). United States v. Fellers, 285 F.3d 721, 724 (8th Cir. 2002) (Fellers I). The Supreme Court reversed our decision and concluded that the officers

had deliberately elicited the statements made at Fellers's home in violation of Fellers's Sixth Amendment right to counsel. Fellers v. United States, 540 U.S. 519, 524-25 (2004) (Fellers II). The Court remanded the case to us for a determination whether Fellers's jailhouse statements should be suppressed as fruits of the initial Sixth Amendment violation and whether the Oregon v. Elstad rationale "applies when a suspect makes incriminating statements after a knowing and voluntary waiver of his right to counsel notwithstanding earlier police questioning in violation of Sixth Amendment standards." Id. at 525.

## II.

Fellers argues that Elstad does not apply to violations of the Sixth Amendment because the Elstad rule was never designed to deal with actual violations of the Constitution. In addition, Fellers argues that Elstad—which was crafted to serve the Fifth Amendment—is inapplicable because it is ill-suited to serve the distinct concerns raised by the Sixth Amendment and because violations of the Miranda rule are fundamentally different from the Sixth Amendment violation at issue in this case. We disagree.

## A.

In Elstad, the Supreme Court held that an initial failure to administer Miranda warnings, in the absence of actual coercion or tactics calculated to undermine an individual's free will, does not require the suppression of subsequent voluntary statements given after proper Miranda warnings and a valid waiver of Miranda rights. Elstad, 470 U.S. at 309. Two policemen went to Elstad's home with a warrant for his arrest for burglary. While in Elstad's living room, one of the officers told Elstad that he believed that Elstad was involved in the burglary. Elstad responded, "Yes, I was there." The officers then took Elstad to the county sheriff's office and advised him of his Miranda rights approximately one hour later. Elstad indicated that he understood his rights and wished to waive them and speak with the officers. Elstad then gave and signed a full written statement regarding his involvement in the

burglary. The trial court suppressed the initial statement made at Elstad's home, but admitted Elstad's signed, written confession. Id. at 300-02. The Supreme Court affirmed the trial court's decision and held that the "fruit of the poisonous tree" doctrine, which would have excluded the subsequent confession if it were tainted by the initial Miranda violation, was inapplicable in the Miranda context. Id. at 306-07.

The Supreme Court stated in Elstad that its rejection of the exclusionary rule in the Miranda context was premised on the fact that a violation of Miranda was not, by itself, a violation of the Fifth Amendment and on the fact that the protections afforded by the Miranda rule sweep more broadly than the Fifth Amendment itself. See id. at 305-07 ("Respondent's contention that his confession...must be excluded as 'fruit of the poisonous tree' assumes the existence of a constitutional violation."). The Court also stated that Wong Sun v. United States, 371 U.S. 471 (1963), stands for the proposition that constitutional violations mandate application of the fruits doctrine. Elstad, 470 U.S. at 308-09. This justification for Elstad's holding, however, was undercut by the Court in Dickerson v. United States, 530 U.S. 428 (2000). In Dickerson, the Court held that Elstad's rationale rested not on the fact that Miranda was not a constitutionally mandated rule, but instead on the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment. Id. at 441. Additionally, we have interpreted Dickerson as "reaffirm[ing] the validity of Elstad by reaffirming the distinction between application of the exclusionary rule following Fourth and Fifth Amendment violations." United States v. Villalba-Alvarado, 345 F.3d 1007, 1012 (8th Cir. 2003).[1]

---

[1]In Chavez v. Martinez, 538 U.S. 760 (2003), a majority of the Supreme Court concluded that a Miranda violation does not, without more, establish a completed violation of the Fifth Amendment. Id. at 772 (plurality opinion), 789 (Kennedy, J., concurring in part and dissenting in part). Neither opinion contradicts Dickerson's analysis of Elstad's constitutional underpinnings.

**B.**

Whether the exclusionary rule applies to evidence acquired subsequent to a constitutional violation requires consideration of the possible admissibility of the evidence in light of the "distinct policies and interests" of each Amendment. See Elstad, 470 U.S. at 306-07; Brown v. Illinois, 422 U.S. 590, 602 (1975). When applied to a confession that is the fruit of unlawful police conduct, the exclusionary rule ensures that the fruits are excluded from trial unless they result from an "intervening act of free will" by the suspect. Wong Sun, 371 U.S. at 486.

Although the exclusionary rule is most often applied in the Fourth Amendment context, its application has not been limited to Fourth Amendment violations. Nix v. Williams, 467 U.S. 431, 442 & n. 3 (1984). The Supreme Court instead has applied the exclusionary rule to violations of both the Fifth and Sixth Amendment. Id. The Court has repeatedly noted, however, that the core reason for extending the exclusionary rule to these areas is to deter police from violating constitutional and statutory protections. Id. at 442-43. See also United States v. Patane, 124 S. Ct. 2620, 2629 (2004) (plurality opinion). Another relevant consideration in extending the exclusionary rule is whether application of the rule would effectuate the purposes of the constitutional provision at issue. See Brown, 422 U.S. at 601.

The Fourth Amendment traditionally mandates a "broad application" of the exclusionary rule. Elstad, 470 U.S. at 306. The exclusionary rule operates in the Fourth Amendment context to deter unreasonable searches and seizures regardless of the probativeness of their fruits. Id. Where the fruits of the Fourth Amendment violation are confessions, courts apply the exclusionary rule to ensure that the confession is not causally linked to the initial illegality. Brown, 422 U.S. at 602-03. By applying the exclusionary rule, courts "assure in every case that the Fourth Amendment violation has not been unduly exploited," and thus effectuate the Fourth Amendment's purpose of prohibiting unreasonable searches and seizures. Id. at 603. Miranda warnings do not obviate the need for the exclusionary rule in the Fourth

Amendment context because the warnings cannot, "alone and per se," ensure that a voluntary confession taken subsequent to a Fourth Amendment violation was an act of free will sufficient to break the causal connection between the violation and the confession. Id.

The Fifth Amendment, in contrast, prohibits the prosecution from using compelled testimony in its case in chief and ensures that any evidence introduced at trial will be voluntary and thus trustworthy. Elstad, 470 U.S. at 306-08. Because confessions or statements taken in violation of Miranda give rise to an irrebuttable presumption that they have been compelled, they must be excluded from the prosecution's case in chief. Id. at 307. This presumption of compulsion, however, does not bar the use of unwarned statements for impeachment purposes. Id. In addition, as Elstad held, the presumption does not preclude the introduction of a subsequent warned statement at trial. Id. at 310-11. Because the Miranda warnings give the suspect the information he needs to choose whether to exercise his right to remain silent, the suspect's choice to speak after receiving Miranda warnings is normally viewed as an "act of free will." Id. at 311 (quoting Wong Sun, 371 U.S. at 486). Furthermore, because the introduction of the subsequent warned statement at trial entails no risk that compelled testimony will be used against a suspect, suppression of the subsequent warned statement neither deters violations of the Fifth Amendment nor ensures that the statement was not compelled. Id. at 308-09. Accordingly, the ordinary exclusionary rule gives way to the Elstad rule, and subsequent warned confessions given after initial Miranda violations are admissible.

The Sixth Amendment prohibits the use at trial of statements deliberately elicited from a suspect after he has been indicted and in the absence of counsel. United States v. Massiah, 377 U.S. 201, 206 (1964). This rule serves to exclude uncounseled post-indictment statements taken in violation of the Sixth Amendment and thereby preserves the integrity and fairness of the criminal trial. See Nix, 467 U.S. at 446.

We conclude that the exclusionary rule is inapplicable in Fellers's case because, as with the Fifth Amendment in Elstad, the use of the exclusionary rule in this case would serve neither deterrence nor any other goal of the Sixth Amendment. Both the deterrence of future Sixth Amendment violations and the vindication of the Amendment's right-to-counsel guarantee have been effectuated through the exclusion of Fellers's initial statements. Although the officers acknowledged that they used Fellers's initial jailhouse statements (obtained after securing a Miranda waiver) in order to extract further admissions from him, there is no indication that the interrogating officers made any reference to Fellers's prior uncounseled statements in order to prompt him into making new incriminating statements. In addition, because Fellers's initial statements related to persons already named in the indictment and to his own personal use of methamphetamine (the drug he was accused of conspiring to distribute and to possess with intent to distribute), the officers would have had a basis for the questions asked during the jailhouse interrogation even if Fellers had said nothing at all at his home. Furthermore, although Fellers's subsequent statements did reestablish matters addressed by his prior unwarned statements, Fellers also made numerous statements about parties, events, and activities not covered in his prior statements. Accordingly, suppression of Fellers's subsequent statements would not promote the fairness of the trial process because their introduction was not unfair to Fellers.

Our conclusion is consistent with historical applications of the exclusionary rule in the Sixth Amendment context. In such cases, evidence acquired after a Sixth Amendment violation is excluded in the absence of proof that the Sixth Amendment violation did not contribute to or produce the subsequent evidence. See, e.g., United States v. Wade, 388 U.S. 218, 235-37 (1967) (excluding identification testimony given subsequent to a post-indictment lineup at which the accused's counsel was not present in violation of the Sixth Amendment). In the case of warned confessions that follow unwarned, uncounseled statements, however, the suspect's knowing, intelligent, and voluntary choice to waive his right to counsel constitutes an

intervening act of free will that breaks the causal link between the prior uncounseled statements (which have already been suppressed) and the subsequent statements.

## C.

The similarities between the Sixth Amendment context at issue in Fellers's case and the Fifth Amendment context at issue in Elstad support our conclusion that the Elstad rule applies when a suspect makes incriminating statements after a knowing and voluntary waiver of his right to counsel, notwithstanding earlier police questioning in violation of the Sixth Amendment. Although the Supreme Court has never explicitly stated that the Elstad rationale is applicable to Sixth Amendment violations, it has emphasized the similarity between pre-indictment suspects subjected to custodial interrogation and post-indictment defendants subjected to questioning.

The Court has held that the scope of the right to counsel varies depending upon the usefulness of counsel to the accused at a particular proceeding and the dangers to the accused of proceeding without counsel. Patterson v. Illinois, 487 U.S. 285, 298 (1988). Unlike during trial, where the accused truly requires aid in meeting his legal adversary, the full "dangers and disadvantages of self-representation" during post-indictment questioning are more apparent to an accused. Id. at 298-300. Furthermore, because "[t]he State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning or expand the limited purpose that an attorney serves when the accused is questioned by authorities," there is no significant difference between a lawyer's usefulness to a suspect during pre-indictment custodial interrogation and his usefulness at post-indictment questioning. Id. at 298-99. An accused is thus permitted to waive his right to counsel as an initial matter after receiving proper Miranda warnings. Id. at 293-94. Such warnings alert the accused to the possible consequences of going forward without counsel during questioning. Id. at 293. In addition, as in the case of unwarned statements taken in violation of Miranda, uncounseled statements obtained in violation of the Sixth Amendment may

be used at trial for impeachment purposes. See Michigan v. Harvey, 494 U.S. 344, 350-52 (1990). Accordingly, a warned post-indictment accused subjected to questioning is similarly situated with a warned pre-indictment suspect subjected to custodial interrogation.

In contrast with the statements made at Fellers's home, Fellers's jailhouse statements were given after a proper administration of Miranda warnings and a proper oral and written waiver of his Miranda rights. The Miranda warnings fully informed Fellers of "the sum and substance" of his Sixth Amendment rights, and his waiver of his Miranda rights operated as a knowing, intelligent, and voluntary waiver of his right to counsel. Patterson, 487 U.S. at 293-94. He was thus given all of the information he needed to decide whether to invoke his Sixth Amendment rights.[2] Furthermore, no evidence indicates that either Fellers's initial statements or his subsequent jailhouse statements were coerced, compelled, or otherwise involuntary. As a result, the condition that made his prior statements inadmissible—the inability to have counsel present or to waive the right to counsel—was removed. See Elstad, 470 U.S. at 314.

---

[2]Fellers's suggestion that the psychological effect of the first statement inherently taints the second statement or coerces a post-indictment accused into expanding upon statements previously made because the first statement "let the cat out of the bag" has been squarely rejected by the Supreme Court. In Elstad, the Court stated that it had "never held that the psychological impact of voluntary disclosure of a guilty secret...compromises the voluntariness of a subsequent informed waiver." Elstad, 470 U.S. at 312. Although the Elstad Court addressed the issue in Fifth Amendment terms, its analysis is equally applicable in this case because of the similarities between a pre-indictment suspect subjected to custodial interrogation and a post-indictment accused subjected to questioning. Furthermore, even if Fellers was unaware of the fact that his prior statements could not be used against him, that ignorance did not compromise the voluntariness of his subsequent waiver of the right to counsel. See id. at 316 ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."); see also Patterson, 487 U.S. at 297.

The Supreme Court's decision in <u>Michigan v. Jackson</u>, 475 U.S. 625 (1986), is not to the contrary. Fellers's Sixth Amendment right to counsel certainly accrued after his indictment, but that fact has no bearing on his ability to waive that right in the first instance. <u>See</u> <u>Patterson</u>, 487 U.S. at 290-91 (fact that suspect's Sixth Amendment right was in existence at time of questioning did not distinguish him from preindictment interrogatee, who also has a right to counsel in existence at time of questioning). Furthermore, <u>Jackson</u> does not bar a post-indictment accused from making an *initial* election whether to proceed with questioning through counsel. <u>Id.</u> at 291. Because Fellers initially chose to go forward without counsel, there is no reason to exclude his uncounseled statements. <u>Id.</u>

### D.

Finally, we conclude that the officers' conduct in this case did not vitiate the effectiveness of the <u>Miranda</u> warnings given to Fellers. We apply a multi-factor test derived from the Supreme Court's recent plurality opinion in <u>Missouri v. Seibert</u>, 124 S. Ct. 2601 (2004), in order to determine whether <u>Miranda</u> warnings delivered between two interrogation sessions are sufficient to fully inform a suspect of his <u>Miranda</u> rights. <u>United States v. Aguilar</u>, 384 F.3d 520, 524 (8th Cir. 2004). We consider: (1) the extent of the first round of interrogation; (2) the extent to which the first and second rounds of interrogation overlap; (3) the timing and setting of both questioning sessions, including whether a continuity of police personnel existed; and (4) the extent to which the interrogator's questions treated the second round as continuous with the first. <u>Id.</u>

In Fellers's case, the facts are much closer—if not identical—to the facts at issue in <u>Elstad</u> than to the facts at issue in <u>Seibert</u> or <u>Aguilar</u>. As in <u>Elstad</u>, the unwarned conversation at Fellers's home was relatively brief. Although the same officers that deliberately elicited statements from Fellers at his home also conducted Fellers's jailhouse interrogation, that interrogation took place almost one half hour later than the conversation at Fellers's home and in a new and distinct setting. In

addition, while Fellers's warned jailhouse statements overlapped to a small degree with his initial unwarned, uncounseled admissions, the jailhouse interrogation went well beyond the scope of Fellers's initial statements by inquiring about different co-conspirators and different allegations. There is also no indication that the officers in this case treated the two rounds of interrogation as continuous, such as by using statements from the unwarned conversation to prompt admissions after receipt of a Miranda waiver. See Seibert, 124 S. Ct. at 2606.

These facts are distinguishable from those in Seibert and Aguilar, where two almost co-extensive interrogations took place in the same interrogation room with little or no break between them. See id. at 2606, 2612 ("When the police were finished there was little, if anything, of incriminating potential left unsaid."); Aguilar, 384 F.3d at 525. The subsequent Miranda warnings thus presented Fellers with a "new and distinct experience" as well as a "genuine choice whether to follow up on the earlier admission." Seibert, 124 at 2612. Given these circumstances, then, to admit Fellers's jailhouse statements is not to fashion a rule that would permit an "end run around Miranda." United States v. Carter, 884 F.2d 368, 373 (8th Cir. 1989) (discussing situation in which officers obtained unwarned admissions from suspect and obtained identical warned handwritten admissions immediately thereafter).

Fellers's case also comports with Justice Kennedy's concurrence in Seibert. 124 S. Ct. at 2614. See also United States v. Briones, 390 F.3d 610, 613 (8th Cir. 2004) ("Because Justice Kennedy relied on grounds narrower than those of the plurality, his opinion is of special significance."). Under Justice Kennedy's framework, the Elstad rule applies in the Fifth Amendment context only in the absence of a deliberate law enforcement strategy designed to obtain incriminating statements in violation of Miranda. Briones, 390 F.3d at 613. Because there is no evidence that the officers in this case employed such a deliberate strategy, the concerns voiced by Justice Kennedy are satisfied.

## III.

Even if Fellers's jailhouse statements should have been suppressed, any error in admitting those statements at trial was harmless beyond a reasonable doubt. Although a defendant's own confession is "a particularly potent piece of evidence," its erroneous introduction is harmless where the other evidence against him is so substantial that it "assured beyond a reasonable doubt that the jury would have returned a conviction even absent the confession." United States v. Santos, 235 F.3d 1105, 1108 (8th Cir. 2000) (internal citations omitted).

Fellers's jailhouse statements, in which he admitted knowing certain co-conspirators and using methamphetamine with them, were either corroborated by other government witnesses or were immaterial to the case. The testimony of each of these corroborating witnesses went largely unchallenged. Although each of the government witnesses had numerous past convictions, had used illegal drugs extensively for a number of years, and were testifying pursuant to plea bargains in hopes of a reduced sentence (all of which was made known to the jury through both testimony and exhibits), their credibility was for the jury to decide. See, e.g., United States v. Aguayo-Delgado, 220 F.3d 926, 935 (8th Cir. 2000).

Furthermore, it is notable that although Fellers admitted to knowing numerous co-conspirators and to using and purchasing methamphetamine, he vehemently denied selling or distributing methamphetamine. Fellers's trial counsel used this fact in his closing argument and intimated that Fellers was not involved in the distribution of methamphetamine because a police officer who was trained to elicit the truth from suspects could not elicit an admission of distribution from Fellers. Accordingly, the introduction of Fellers's jailhouse admissions at worst had no effect on the verdict and at best militated against a conviction for conspiracy to possess methamphetamine with intent to distribute.

To prove conspiracy to distribute or to possess methamphetamine with intent to distribute, "the government must prove that two or more persons reached an agreement to distribute or possess with intent to distribute methamphetamine, that the defendant voluntarily and intentionally joined the agreement, and that at the time that the defendant joined the agreement he knew its essential purpose." United States v. Aguilar-Portillo, 334 F.3d 744, 747 (8th Cir. 2003). At trial, the government presented eight witnesses who detailed the extent of the conspiracy as well as Fellers's involvement in both possession and distribution of methamphetamine. Although "a reasonable mind could entertain concerns about 'the reliability and consistency of these accounts'" given the witnesses' plea bargains, criminal histories, and past drug use, see id., the evidence presented by the government in this case is sufficient to prove that Fellers conspired to possess methamphetamine with intent to distribute. Accordingly, any error in admitting Fellers's jailhouse statements was harmless.

**IV.**

Fellers last contends that the district court improperly enhanced his sentence based on facts not found by a jury, admitted by him, or proved beyond a reasonable doubt. Specifically, he argues that both the district court's increase of the drug quantity attributable to him beyond that found by the jury and the district court's reliance on facts underlying a prior expunged conviction—as opposed to the fact of the conviction itself—in order to increase his criminal history category violate his Sixth Amendment right to trial by jury.

In its recent decision in United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory federal sentencing guidelines system was unconstitutional and that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 755-56. Because the jury in Fellers's case

-13-

specifically found that Fellers was responsible for between 50 and 500 grams of methamphetamine and specifically rejected an alternative verdict stating that Fellers was responsible for more than 500 grams of methamphetamine, the district court's decision to enhance Fellers's sentence based upon the latter figure was in error. Because Fellers raised this issue at sentencing, he is entitled to a new sentencing hearing.[3]

Fellers's conviction is affirmed, but his case is remanded for resentencing in accordance with <u>Booker</u>.

_____

---

[3]Because the district court's enhancement of Fellers's sentence based upon an increased drug quantity entitles him to a resentencing in and of itself, we see no need to decide whether the increase in his criminal history category similarly entitles him to relief. We note, however, that the conduct underlying the expunged offense was admitted by the defendant in the context of a guilty plea.

-14-